**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Greyhound Lines Incorporated, | No. CV-15-01820-PHX-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Viad Corporation, | |
| Defendant. | |

Plaintiff Greyhound Lines, Inc. filed a complaint against Defendant Viad Corp. Doc. 1. Greyhound seeks damages and declaratory relief for Viad's alleged failure to satisfy its statutory and contractual obligations to indemnify Greyhound for costs associated with environmental damages on certain specific properties, as well as for nuisance. *Id*., ¶ 25; Doc. 30. Viad responded to Greyhound's complaint and asserted its own counterclaims, seeking declaratory and monetary relief for an alleged breach of contract, as well as indemnification for environmental costs paid by Viad. Doc. 15, ¶¶ 30-53. Viad subsequently amended its counterclaims to include allegations of fraud and negligent misrepresentation. Doc. 31, ¶¶ 49-68.

Greyhound and Viad have filed cross-motions for partial summary judgment. The motions are fully briefed, and the Court heard oral argument on November 10, 2016. For the reasons set forth below, the Court will grant Greyhound's motion for summary judgment as to the fraud and misrepresentation claims, and deny Greyhound's and Viad's motions for summary judgment on the contract claims.

## I.     Background.

Between 1986 and 1999, Greyhound and Viad entered into four contracts (collectively, "Agreements"), which are at the center of this litigation.   First, on December 22, 1986, the parties entered into an Acquisition Agreement that provided for the sale of certain of Viad's assets – including real properties – to Greyhound.  Doc. 66-10.  As part of the Acquisition Agreement, Viad indemnified Greyhound for costs related to general liabilities and obligations.  *Id.* at 50-51.  Several amendments were made to the Acquisition Agreement, but only the Third Amendment, dated March 18, 1997, is relevant here.   Article III of the Third Amendment laid out several detailed changes concerning Viad's liability to Greyhound for environmental matters.  Doc. 66-11 at 7. Specifically, the Third Amendment created a particular scheme for remediation of contamination caused by underground storage tank ("UST") leaks at the various properties.  *Id.* at 8.

On August 23, 1991, the parties entered into a Claims Treatment Agreement. Doc. 66-12.  Section 14(a) addressed environmental indemnification between the parties, clarifying their respective responsibilities under the amended Acquisition Agreement and limiting Viad's liability for remediation to contamination identified prior to March 1, 1992.  *Id.* at 11.  Finally, in 1999, the parties entered into a Settlement Agreement which further clarified the responsibilities of the parties under the amended Acquisition Agreement and Claims Treatment Agreement by amending them to include newly defined terms.  Doc. 66-13 at 3.  The Court will discuss the provisions of the Agreements in more detail below.

There are numerous factual disputes concerning the parties' performance under the Agreements, but it is undisputed that Greyhound has submitted reimbursement requests to Viad over the years and some have been paid.  Viad has made no payment since 2009. Doc. 73 at 51; Doc. 90 at 51.  Viad's Director of Environment and Energy from 1987 to 2001, Ken Ries, was responsible for coordinating and overseeing remediation efforts for Viad in connection with the properties covered by the Agreements.  Doc. 66, ¶ 37; Doc.

89, ¶ 37.  Since 2001, Ries has continued to work for Viad as an independent consultant in the same capacity.  *Id.*

On September 11, 2015, Greyhound brought a claim against Viad seeking declaratory and monetary relief for breach of contract and private nuisance.  Doc. 1.  Additionally, Greyhound seeks cost recovery under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA").  Doc. 30.  According to the complaint, Viad has "failed to meet its obligations under both its statutory obligations and the [Agreements] to pay for the environmental costs incurred by" Greyhound.  *Id.*, ¶ 25.  Viad's counterclaim alleges breach of contract and also seeks declaratory and injunctive relief.  Doc. 31.  According to Viad, Greyhound "has improperly sought and obtained payment from Viad for costs associated with Environmental Obligations of which Viad was not notified before March 1, 1992[.]"  *Id.*, ¶ 22.

The claims relate to six properties, located in Portland, Seattle, Memphis, Miami, Jacksonville, and Oakland.  Doc. 64 at 6; Doc. 72 at 1.  Greyhound sold the Seattle and Miami properties to third parties in 2008 and 2013, respectively.  Doc. 73, ¶¶ 27, 36; Doc. 90, ¶¶ 27, 36.   Greyhound seeks reimbursement from Viad for costs incurred in the sale of these properties relating to environmental conditions thereon.

## II.    Legal Standard.

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at

trial." *Celotex*, 477 U.S. at 322.  Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The parties' arguments focus on Arizona law, and no choice-of-law issues have been raised.  The Court therefore will look to Arizona law for the relevant statutes of limitations, principles of contract interpretation, accord and satisfaction, and the economic loss doctrine.

## III.   Greyhound's Motion for Summary Judgment.

### A.   Statute of Limitations.

Greyhound argues that Viad's counterclaims are time-barred.  The Court finds that disputed facts prevent summary judgment on this issue.

#### 1.   Arizona Law.

Arizona law applies the discovery rule to cases under both contract and tort law. *Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*, 898 P.2d 964, 967-68 (Ariz. 1995).  "Under the discovery rule, a plaintiff's cause of action does not accrue until the plaintiff knows or, in the exercise of reasonable diligence, should know the facts underlying the cause." *Id.* at 966.  The discovery rule is motivated by the equitable concern that "it is unjust to deprive a plaintiff of a cause of action before the plaintiff has a reasonable basis for believing that a claim exists." *Id.* at 967.  Courts have recognized that statutes of limitations are intended to protect defendants from stale claims where plaintiffs have slept on their rights, but "[a] blamelessly uninformed plaintiff cannot be said to have slept on his rights." *Walk v. Ring*, 44 P.3d 990, 995-96 (Ariz. 2002)*.*

The key "inquiry in applying the discovery rule is whether the plaintiff's injury or the conduct causing the injury is difficult for plaintiff to detect." *Gust,* 898 P.2d at 968.  Importantly, the discovery rule "does not permit a party to hide behind its ignorance when reasonable investigation would have alerted it to the claim." *ELM Ret. Ctr., LP v. Callaway*, 246 P.3d 938, 941 (Ariz. Ct. App. 2010).  In a breach of contract case, this

means that a party must still "exercise[] reasonable diligence in monitoring the performance of another under the contract." *Gust,* 898 P.2d at 969.  Where the "wrong constituting the cause of action is concealed, limitation will not begin to run until such concealment is discovered, or reasonably should have been discovered." *Walk,* 44 P.3d at 995 (*citing Acton v. Morrison,* 155 P.2d 782, 784 (Ariz. 1945)).  Accordingly, "the core question is whether a reasonable person would have been on notice to investigate." *Id.* at 996.  "[S]ummary judgment is warranted only if the failure to go forward and investigate is not reasonably justified." *Id*.

The Arizona Supreme Court has made clear that "[w]hen discovery occurs and a cause of action accrues are usually and necessarily questions of fact for the jury." *Doe v. Roe*, 955 P.2d 951, 961 (Ariz. 1998); *Walk*, 44 P.3d at 996.  "The jury must determine at what point Plaintiff's knowledge, understanding, and acceptance in the aggregate provided sufficient facts to constitute a cause of action." *Doe*, 955 P.2d at 962.  "A plaintiff need not know *all* the facts underlying a cause of action to trigger accrual. But the plaintiff must at least possess a minimum requisite of knowledge sufficient to identify that a wrong occurred and caused injury." *Id.* at 961 (emphasis in original; internal citation omitted).

Additionally, Arizona law permits the tolling of the statute of limitations "when a party wrongfully conceals *facts giving rise to the cause of action* so as to prevent a potential plaintiff from reasonably discovering the claim's existence during the limitation period." *Walk*, 44 P.3d at 999 (emphasis in original).  "In general, to toll the statute of limitations the fraud must prevent inquiry, elude investigation or mislead the party who claims the cause of action.  The concealment must come after the injury, and there must be some affirmative act of the defendant calculated to obscure the existence of a cause of action." *Anson v. Am. Motors Corp.*, 747 P.2d 581, 588 (Ariz. Ct. App. 1987) (internal quotation marks and citations omitted); *Cooney v. Phoenix Newspapers, Inc*., 770 P.2d 1185, 1187 (Ariz. Ct. App. 1989); *Tovrea Land & Cattle Co. v. Linsenmeyer*, 412 P.2d 47, 63 (Ariz. 1966) ("Mere silence by the person allegedly committing the fraud will not

1    avoid the running of the statute.  There must be positive acts of concealment done to

2    prevent detection.  There must be some trick or contrivance intended to exclude suspicion

3    and prevent inquiry.").

4         "The defense of statute of limitations is never favored by the courts, and if there is

5    doubt as to which of two limitations periods should apply, courts generally apply the

6    longer."  *Gust,* 898 P.2d at 968.  Because the statute of limitations is an affirmative

7    defense, the burden of proof lies with the defendant.  *Estate of Page v. Litzenburg*, 865

8    P.2d 128, 135 (Ariz. Ct. App. 1993).  The burden of proving the statute was tolled,

9    however, rests with the claimant.  *Engle Bros. v. Superior Court In & For Pima Cty.*, 533

10   P.2d 714, 716 (Ariz. Ct. App. 1975).  Similarly, "[t]he burden of establishing that the

11   discovery rule applies to delay the statute of limitations rest[s] on plaintiff."  *Logerquist*

12   *v. Danforth*, 932 P.2d 281, 284 (Ariz. Ct. App. 1996).

13                    **2.    Viad's Claims.**

14        Greyhound argues that Viad's breach of contract claims are subject to a six-year

15   statute of limitations under A.R.S. § 12-548, and that Viad's claims for fraud and

16   negligent misrepresentation are subject to at least a three-year statute of limitations under

17   A.R.S. §§ 12-542.[1]  Doc. 64 at 14-15.  Viad does not dispute these limitation periods, but

18   argues that it did not learn the facts underlying its claims until after Greyhound filed this

19   lawsuit.  Doc. 78 at 14.  Viad also contends that Greyhound intentionally concealed

20   information that would have put Viad on notice that it was being wrongfully billed for

21   remediation for which it was not contractually liable.  *Id.* at 11-14.  Because Viad seeks

22   to recover for alleged overpayments it made to Greyhound, and Viad last made a

23   payment to Greyhound on March 25, 2009, the only issues are when the respective

24   limitations periods commenced, and whether the periods were subject to tolling.  As

25   discussed above, Viad has the burden of proof on both of these issues.[2]

26

27       [1] Greyhound contends that the fraud and negligent misrepresentation claims may
     also be subject to a two-year statute of limitations under A.R.S. § 12-543.  The Court

28   need not decide which statute of limitations applies at this time.

       [2] Viad alleges that its tort claims relate back to October 7, 2015, when Viad first

The Court concludes that a genuine factual dispute precludes summary judgment. Greyhound contends that Viad had an in-house expert, Ken Ries, monitoring environmental work at the properties, reviewing invoices sent by Greyhound, reviewing explanatory information provided by Greyhound, and tracking the work and payments for each site on his own internal spreadsheets. Greyhound alleges that Ries had access to all of the information he requested, that he visited Greyhound and the properties in question, and that he spoke directly with consultants performing the work. Greyhound notes that Ries had been responsible for these sites for more than 30 years, and thus was intimately familiar with their contamination and the required remediation. As a result, Greyhound asserts, Viad knew or should have known precisely what work was being done at the properties and the scope of work covered by Greyhound's bills to Viad – the very facts on which Viad now bases its breach of contract and tort claims.

Viad paints a different picture. It asserts that Greyhound knew it was investigating and remediating contamination for which Viad was not responsible under the Agreements, and yet billed Viad for that work on a regular basis. Viad asserts that Greyhound never informed Ries of this fact, and withheld key information that would have revealed that improper payments were being sought. Viad contends that Ries relied not only on the incomplete information provided by Greyhound, but also that Greyhound undertook an obligation in the Agreements to bill only for work for which Viad was responsible. Viad provides specific examples of contamination for which Greyhound allegedly was solely responsible at each of the sites, and yet which was included in the work for which Viad was billed. Additionally, Viad contends that Greyhound actively concealed information regarding new sources of contamination at the relevant properties and failed to provide information that Ries requested when reviewing reimbursement requests. Doc. 78 at 14-15; Doc. 89, ¶¶ 130-133.

This sharp factual disagreement precludes summary judgment. As Arizona courts

---

filed its counterclaims in this action. Doc. 78 at 10 n.1. This is still more than six years after the last payment received by Greyhound.

have noted, application of the discovery rule and related tolling doctrines often present factual issues that must be resolved at trial. *Doe*, 955 P.2d at 961; *Walk*, 44 P.3d at 996. This is such a case.[3]

## B. Collateral Estoppel.

"Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States*, 440 U.S. 147, 153 (1979). "To foreclose relitigation of an issue under collateral estoppel: (1) the issue at stake must be identical to the one alleged in the prior litigation; (2) the issue must have been actually litigated in the prior litigation; and (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in the earlier action." *Clark v. Bear Stearns & Co., Inc.,* 966 F.2d 1318, 1320 (9th Cir. 1992). When analyzing a party's attempt to assert collateral estoppel, "[t]he party asserting preclusion bears the burden of showing with clarity and certainty what was determined by the prior judgment." *Id.* at 1321. "Since the doctrine of collateral estoppel applies only to matters actually litigated, it is imperative that the party claiming estoppel adequately show the controlling facts of the prior litigation." *United States v. Lasky*, 600 F.2d 765, 769 (9th Cir. 1979).[4]

---

[3] Viad claims that it satisfied the requirement of due diligence by requiring Greyhound "to confirm that the work for which it billed was properly allocated to Viad under the parties' agreement." Doc. 78 at 16. Viad cites *Gust* for the assertion that "[a] party is not required to obtain more than a solemn promise to perform to satisfy the diligence requirement." *Id.* at 16-17. The Court does not agree. *Gust* held that the protection of the discovery rule is not lost because a plaintiff *failed* to require in a contract that that the opposing party advise it of specific adverse events, but it did not hold that such a contract provision will satisfy the requirement of due diligence in all cases. 898 P.2d at 969. This is part of the factual issue to be addressed in this case. The parties' contractual agreements will be relevant to whether Viad acted reasonably, but the Court cannot accept the suggestion that the contracts alone prove due diligence. The jury in *Gust* found that the plaintiff engaged in reasonably diligent monitoring. *Id.* The same inquiry will be required in this case.

[4] The parties do not address in their briefs whether federal or Arizona state law governs the collateral estoppel issue raised by Greyhound, but rather assume federal law applies. Precedent from the Supreme Court and Ninth Circuit indicate that Arizona law may in fact be the relevant governing law. *See Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497 (2001); *Taco Bell Corp. v. TBWA Chiat/Day Inc.*, 552 F.3d 1137,

Greyhound argues that:

> Viad is precluded from arguing (i) that it did not have notice of the Environmental Obligations if the evidence shows that Viad was informed (either by [Greyhound], a regulator, or by the fact that Viad itself was performing the work) of subsurface contamination prior to March 1, 1992; and (ii) that releases to the subsurface, regardless of whether a specific tank or constituent can be identified, are Environmental Obligations for which it owes indemnification.

Doc. 64 at 14.  According to Greyhound, these issues are identical to issues decided in a 2002 case between Greyhound and Viad before the United States District Court for the Southern District of California ("San Diego case").  *Id.*  Viad argues that the issues in the San Diego case are irrelevant to its claims here.  Doc. 78 at 8.  The Court has reviewed the decision in the San Diego case, and the Ninth Circuit's affirmance of that decision, and concludes that collateral estoppel does not apply.

On the question of notice, the judge in the San Diego case made a fact-specific decision, finding that Greyhound "has provided no less than seven specific instances in which either [Greyhound] or a regulatory agency informed [Viad] of the contamination plume, and its effect on the area properties (including the Bosa property)."  Doc. 70-9 at 7.  The judge relied on specific communications and attachments to conclude that Viad was informed of the contamination and its effect on the adjacent property.  This decision would be controlling if the issues in this case included the same contamination, the same adjacent property, and the same communications, but it does not.  The alleged notices at issue in this case concern different properties, different contamination, and different communications.  The issues are not identical.

Nor can the Court find the San Diego case controlling on whether releases to the

---

1144 (9th Cir. 2009).  Collateral estoppel analysis under federal law and Arizona law, however, are substantially similar.  *See Hullett v. Cousin,* 63 P.3d 1029, 1034-35 (Ariz. 2003) ("Collateral estoppel . . . applies when an issue was actually litigated in a previous proceeding, there was a full and fair opportunity to litigate the issue, resolution of the issue was essential to the decision, a valid and final decision on the merits was entered, and there is a common identity of parties.").  Because the Court finds that collateral estoppel would not bar Viad's claims under either Arizona or federal law, the Court need not decide which law governs here.

subsurface constitute an Environmental Obligation.  In addition to the fact that this too was a fact-specific issue in the San Diego case, the judge in that case was not required to decide the matter, noting instead that "it is undisputed that the harm at issue (hydrocarbon plumes, soil and water contamination) constitute[s] an Environmental Obligation as defined in [the parties'] Agreement."  *Id.* at 6 n.1.  The Ninth Circuit likewise noted that "Viad concedes that the harm to Bosa's property constitutes an Environmental Obligation within the meaning of the Settlement Agreement[.]"  *Bosa Dev. of Cal., Inc. v. Shell Oil Co.*, 71 Fed. Appx. 632 (9th Cir. 2003).  The issue was not identical and was not actually litigated.

### C.   Accord and Satisfaction.

Greyhound claims that the Settlement Agreement constituted an accord and satisfaction that resolved Viad's claim for recovery of erroneous overpayments and Greyhound's claim for past due indemnity payments.  Doc. 91 at 13.  According to Greyhound, Viad's agreement to pay the amount owed and Greyhound's agreement to offset the amount of erroneous payments, once carried out, "served to bar an action on Viad's current claim to recover alleged erroneous payments made prior to the 1999 Settlement."  *Id.*

"An accord and satisfaction discharges a contractual obligation or cause of action when the parties agree to exchange something of value in resolution of a claim or demand and then perform on that agreement, the accord being the agreement, and the satisfaction its execution or performance."  *Abbott v. Banner Health Network*, 372 P.3d 933, 937 (Ariz. 2016) (internal quotation marks and citation omitted).  The elements necessary for an accord and satisfaction are the same as those required to form a contract:  "(1) A proper subject matter, (2) competent parties, (3) an assent or meeting of the minds of the parties, and (4) a consideration."  *Vance v. Hammer*, 464 P.2d 340, 343 (Ariz. 1970).  The first, second, and fourth elements are not at issue.  Viad claims that there was no meeting of the minds because the parties did not agree to resolve the matters at issue in its counterclaim when they entered into the Settlement Agreement.  Doc. 78 at 17.

The Court is not persuaded that there was an accord and satisfaction in this case. Greyhound cites nothing besides the Settlement Agreement in support of its motion, and the Agreement does not contain an express release of all claims for overpayment that Viad might have had prior to execution of the Agreement.  The Settlement Agreement does reflect the parties' acknowledgement that Viad overpaid Greyhound by $158,435, and the parties clearly reached an enforceable contract to resolve this amount in dispute, but the Settlement Agreement does not mention any of the other payments that are now at issue.  Section 1.6 – cited by Greyhound for the first time in its reply brief – does say that the parties "have been in dispute about the meanings of certain provisions of [the Agreements] regarding liability for environmental matters first identified on or after March 1, 1992," and that the parties "enter into this Agreement to fully and finally resolve such dispute."  Doc. 66-13 at 1.  But the specific amount then resolved in the Agreement is the $158,435 in overpayments mentioned in § 3.3.  No other claims are discussed or resolved, and the Settlement Agreement specifically states that it "contain[s] the entire agreement between the parties[.]"  *Id.* at 5.  This limits the Settlement Agreement to the claims expressly resolved.  Greyhound provides no other evidence of an accord and satisfaction.[5]

### D.    Economic Loss Doctrine.

Greyhound argues that Viad's tort claims for fraud and negligent misrepresentation are barred by Arizona's economic loss doctrine.  The economic loss doctrine is "a common law rule limiting a contracting party to contractual remedies for the recovery of economic losses unaccompanied by physical injury to persons or other property."  *Flagstaff Affordable Hous. Ltd. P'ship v. Design All., Inc.*, 223 P.3d 664, 667 (Ariz. 2010); *Apollo Grp., Inc. v. Avnet, Inc.*, 58 F.3d 477, 479 (9th Cir. 1995) (Applying Arizona law and commenting that "[g]enerally, under the 'economic loss' rule, a plaintiff

---

[5]    Greyhound does contend that the parties fully reviewed the history of their contractual relationship before entering into the Settlement Agreement.  Viad disputes this assertion (Doc. 64 at 20; Doc. 78 at 18), but even if true it would not show that the parties arrived at a meeting of the minds on claims not mentioned in the Agreement.

who suffers only pecuniary injury as a result of the conduct of another cannot recover those losses in tort. Instead, the claimant is limited to recovery under the law of contract.").  Economic loss "refers to pecuniary or commercial damage[.]"  *Flagstaff*, 223 P.3d at 667.  As the Arizona Supreme Court emphasized, "[t]he principal function of the economic loss doctrine, in our view, is to encourage private ordering of economic relationships and to uphold the expectations of the parties by limiting a plaintiff to contractual remedies for loss of the benefit of the bargain."  *Id.* at 671.

Arizona has not yet considered whether the economic loss doctrine applies to cases concerning indemnification contracts.  On this issue of first impression, the Court "must use [its] best judgment to predict" how the state's highest court – in this case the Arizona Supreme Court – would interpret the doctrine.  *Burlington Ins. Co. v. Oceanic Design & Constr., Inc.,* 383 F.3d 940, 945 (9th Cir.2004) (citation and internal quotations omitted).

Viad argues that the Arizona Supreme Court has applied the economic loss doctrine only to product liability and construction cases, and the Court therefore would be improperly expanding the doctrine by applying it here.  Doc. 78 at 19 (*citing Flagstaff*, 223 P.3d at 66; *Atlas Flooring, LLC v. Porcelanite S.A. de C.V.*, 425 F. App'x 629, 633 (9th Cir. 2011)).  The Court does not find, however, that the *Flagstaff* decision intended to limit the application of the doctrine to product liability and construction cases.  Rather, the Arizona Supreme Court explained that application of the doctrine to various tort claims requires a context-specific analysis that must take into account the policies behind contract and tort law.  *Flagstaff*, 223 P.3d at 669.  While tort law seeks to promote safety and spread the costs of accidents, contract law "seeks to preserve freedom of contract and to promote the free flow of commerce."  *Id.*  Thus, if "common law contract remedies provide an adequate remedy because they allow recovery of the costs of remedying the defects . . . and other damages reasonably foreseeable to the parties upon entering the contract[,]" there is no strong policy reason to also provide a tort remedy.  *Id.*

In 2011, the Arizona Court of Appeals applied the economic loss doctrine to bar

tort claims relating to a pest control company's failure to rid a home of termites after the parties had entered into a contract for termite treatment. *Cook v. Orkin Exterminating Co.*, 258 P.3d 149, 150 (Ariz. Ct. App. 2011). In addition to breach of contract claims, the homeowners brought negligence, misrepresentation, and fraud claims relating to the company's allegedly misleading statements that it could rid their house of termites and would repair any damages caused by termites after the treatment. *Id.* at 153. The Court "held that the Cooks are limited to their contractual remedies for purely economic loss from Orkin's alleged failure to adequately perform its promises under the Agreement. Because the Cooks are seeking remedies for purely economic loss from Orkin's alleged failure to adequately perform its promises under the Agreement, the [economic loss rule] bars their tort claims." *Id.*

Several cases decided by this Court have also predicted that Arizona courts would apply the economic loss doctrine outside of construction and product liability cases. This Court held that the economic loss doctrine applied to bar tort claims alleging conversion and fraud in the performance of a contract for credit card payment processing services. *TSYS Acquiring Sols., LLC. v. Elec. Payment Sys., LLC*, No. CV10-1060 PHX, 2010 WL 3882518, at *3-4 (D. Ariz. Sept. 29, 2010). In reaching this conclusion, the Court noted that the harms alleged in these claims arose directly from the "failure to provide the benefit of the parties' bargain[.]" *Id.* at *4 ("Because the harm alleged by the conversion counterclaim is the failure to receive the property or interest promised by the parties' contract, and not some separate harm, the counterclaim is barred by the economic loss rule."); *see also Int'l Franchise Sols. LLC v. BizCard Xpress LLC*, No. CV13-0086 PHX DGC, 2013 WL 2152549, *3 (D. Ariz. May 16, 2013) (applying the economic loss doctrine to bar tort claims alleging negligence and negligent misrepresentation in the carrying out of a franchise agreement, finding that "[t]he contract law policy of upholding the expectations of the parties would be undermined by allowing BizCard's tort claims to proceed").

Another case applied the economic loss doctrine in the context of a supply

contract where the defendant agreed to charge the plaintiff prices set in compliance with certain enumerated criteria. *Maricopa Cty. v. Office Depot, Inc.*, No. 2:14-CV-1372-HRH, 2014 WL 6611562, at *1 (D. Ariz. Nov. 21, 2014). The plaintiff brought both tort and contract claims against the defendant. *Id.* at *2. The tort claims alleged that the defendant engaged in common law fraud by misrepresenting that the plaintiff was being charged the lowest prices of any government entity for office supplies, informing the plaintiff that prices had been approved in accordance with contractual terms when they had not, and withholding from the plaintiff the fact that it was charging other government entities lower prices. *Id.* at *3. According to the court, "[b]ecause plaintiff's common law fraud claims are based on the same alleged conduct as its contract claims, these claims are barred by the economic loss rule." *Id.* at *7.

Viad argues that the harm alleged in its tort claims "results not from a frustration of the parties expectations, but from the intentional or negligent concealment of material information." Doc. 78 at 19. Viad argues that this case is distinct from *TSYS* and *Cook* where "the alleged fraud was merely a breach of the promise to perform under the parties' agreements." *Id.* at 20. The Court is not persuaded. Viad claims that Greyhound committed breach of contract by billing Viad for contamination Viad was not required to pay for under the parties' Agreements. Viad claims that Greyhound committed fraud and misrepresentation by billing Viad for the same contamination. *Id.* at 11, 16, 19-20. The wrong is the same: Greyhound's alleged billing for payments to which it was not entitled under the Agreements. The harm is also the same: Viad seeks $2,118,934.27 for its contract claims and the same amount for its tort claims. *Id.*

Viad provides no reason why contract remedies are inadequate to redress the harm it has suffered from Greyhound's alleged non-compliance with the Agreements. Viad and Greyhound are both sophisticated corporate parties, and easily could have provided for such risks in their contracts. Limiting Viad to its contract remedies would serve the important policy, recognized in *Flagstaff*, "of encouraging parties to [commercial] contracts to allocate risk prospectively and identify remedies within their agreements[.]"

1    *TSYS*, 2010 WL 3882518, at *2.  The Court accordingly concludes that the economic loss

2    doctrine applies and will dismiss Viad's claims for fraud and misrepresentation.[6]

3    **IV.    Viad's Motion for Summary Judgment.**

4          **A.    Viad's Liability under the Agreements.**

5          Viad asks the Court to hold that its liability under the Agreements is "limited to

6    Viad's percentage share of costs incurred by Greyhound in remediating contamination

7    caused by specific [UST] leaks that Viad was notified of prior to March 1, 1992[.]"

8    Doc. 72 at 20.  Viad argues that the Agreements, particularly the Third Amendment to the

9    Acquisition Agreement, limit its liability to UST leaks.

10         Viad relies on the language of the Agreements, and also on evidence regarding the

11   parties' understanding of and course of dealing under the Agreements.  In opposing the

12   motion, Greyhound also looks to the language of the Agreements, as well as to other

13   evidence that suggests its meaning.  Neither party addresses the legal role to be played by

14   evidence outside the Agreements; both seem to think that the Court can readily look to

15   such evidence in interpreting the Agreements on this summary judgment motion.

16         The only issue to be decided in this order is whether Viad's interpretation of the

17   Agreements is correct as a matter of law and undisputed fact.  If it is, summary judgment

18   on this issue can be entered for Viad.  If it is not, the Court need not attempt to provide a

19   definitive interpretation of the Agreements.  Greyhound's motion does not ask the Court

20   to adopt its view by summary judgment.

21         The Court concludes that the contract language does not support Viad's view that

22   its environmental liabilities are limited to USTs at the properties.  The Court also finds

23   that the parties present conflicting evidence regarding their respective understandings of

24   the Agreements, requiring a trial to determine the Agreements' final meaning.  The Court

25

26         [6] Consistent with the analysis in *Flagstaff* as applied in *TSYS*, the Court also notes that the injuries allegedly suffered by Viad are not to an interest outside the scope of the parties' agreements.  *TSYS*, 2010 WL 3882518, at *2.  It is squarely within the parties'

27   Agreements – Viad's right to pay only for the environmental liabilities assigned to it in the Agreements.  Nor did the parties specify in the Agreements that tort remedies would

28   be available in a case such as this.  *Id.*  Both of these factors further support application of the economic loss doctrine.  *Id.*

will review each of the Agreements and explain why their language does not support Viad's narrow interpretation.

The Acquisition Agreement signed in 1986 imposed broad and unrestricted indemnification obligations on Viad.  Those obligations included "any claim, action, proceeding, damage, liability, loss, cost, expenses, judgment, fine, penalty or deficiency . . . arising out of, or resulting from or related to . . . [a]ny liability or obligation of [Viad]." Doc. 66-10 at 50-51.

Three months later, the parties signed the Third Amendment to the Acquisition Agreement.  Viad relies upon this contract as narrowing its environmental obligations to USTs.  Section III of the Third Amendment is titled "Environmental Matters" and was intended by the parties to "make certain arrangements with respect to certain underground storage tanks on properties [covered by the Acquisition Agreement]." Doc. 66-11 at 7.

Section 3.3 is the key to Viad's argument.  It provides in relevant part that, "[n]otwithstanding any provision of the Acquisition Agreement to the contrary, [Viad] shall be obligated to bear a proportionate share of any costs, fees, expenses, fines, penalties and governmental levies associated with remediation done in respect of leaks from the Tanks, and the actual costs or expenses of remediation of the properties where the Tanks are located . . . (collectively, the 'Remediation Expenses')." *Id.* at 8.  "[Viad's] proportionate share" for these UST expenses "shall be 100% of the Remediation Expenses for a period of one year after the Closing Date, and shall decrease linearly 20% every year thereafter, such that the Seller is not responsible for any Remediation Expenses from and after five years after the Closing Date."  *Id.*  The agreement thus includes a step-down process under which Viad's liability for UST remediation would decrease each year, reaching zero after five years.  Section 3.3 makes clear that "[Greyhound] shall be obligated to bear the remaining share of the Remediation Expenses." *Id.*

From this language, and the earlier statement in the Third Amendment explaining

that it is intended "to make certain arrangements with respect to certain underground storage tanks," Viad argues that its liability for environmental matters was limited to leaking USTs.  And because the Third Amendment clearly modified the Acquisition Agreement and its broad imposition of liability, Viad argues that UST leaks became its only responsibility after the Third Amendment.

The problem with Viad's argument is that it entirely overlooks the plain language of section 3.3, as well as section 3.5 of the Third Amendment:

> Application.  This Article supersedes in its entirety any other representations, covenants or agreements (including without limitation indemnification agreements) contained in the Acquisition Agreement *only with respect to the matters specifically described in this Article* and does affect any other representations, covenants or agreements (including without limitation indemnification agreements) contained in the Acquisition Agreement with respect to any other matter (including without limitation other environmental matters).

*Id.* at 9 (emphasis added).[7]

The highlighted language suggests that the "only" amendment to the Acquisition Agreement is with respect to matters "specifically described in this Article [III]."  And the only matters specifically described in Article III are USTs – those are the specific items addressed in sections 3.1 through 3.4 of the article.  Nowhere does Viad point to language that would suggest that contamination caused by UST leaks was intended to be the only contamination for which Viad is responsible.  As a result, Viad's liability for any other matter under the Acquisition Agreement, including its broad indemnification obligation for other environmental matters, does not appear to be changed.   Viad's

---

[7] The second clause of § 3.5 does not contain the word "not" between "does" and "affect" as would seem to be the natural reading.  The Court notes that, as written, the second clause would seem to nullify the first.  The language of the first clause is clearly intended to limit the amendment's effects on the parties' division of liability to explicit changes contained in Article III.  During oral argument, Greyhound indicated that it had always read the provision to include the word "not" in the second clause, and Viad similarly had not noticed the absence of the word prior to the Court's questioning.  The Court cannot add a word that is not in the document, but will read the first part of § 3.5 according to its plain meaning so as to avoid an absurd result.  Regardless, there is no language in § 3.5 which would suggest an intent to supersede and replace all other assignments of liability made in the Acquisition Agreement.

environmental liabilities were narrowed by the Third Amendment, but only in the step-down process put in place for UST contamination.

The foregoing is based solely on the language of the Third Amendment.  It does not include evidence of the parties' intent or course of dealing, on which there are factual disputes.  It is possible that additional evidence will change the Court's interpretation of the agreement.  For example, Greyhound conceded during oral argument that it has always understood that the step-down process in § 3.3 applies to all of Viad's environmental liabilities under the Agreements, not just those limited to USTs, and that it is seeking indemnification from Viad in accordance with this understanding.[8]  *See also* Doc. 80 at 7.  The Court cannot now judge how parol or course of dealing evidence will affect its interpretation of the Third Amendment, but it can conclude that the plain language of the document does not support Viad's contention.  As a result, the Court cannot enter summary judgment in Viad's favor on this issue, even though later evidence may be seen to support Viad's position.

In August 1991, the parties entered into the Claims Treatment Agreement.  It too limited Viad's responsibilities, but not to contamination from USTs.  Section 14(a) provided that "[t]he environmental indemnities in the Acquisition Agreement shall be modified as follows: [Viad] shall have no obligation to indemnify [Greyhound] for any liabilities for environmental matters or claims, regardless of when the acts giving rise to liability occurred, and [Greyhound] shall assume all such environmental obligations and indemnities, *except* . . . indemnities arising from liabilities which are identified prior to March 1, 1992."  Doc. 66-12 at 11 (emphasis added).  The agreement further provided that the liabilities identified before March 1, 1992 "shall continue to be governed by the Acquisition Agreement" (*id.*), which is defined to include the Third Amendment.  *Id.* at 2.  Thus, the Claims Treatment Agreement narrowed Viad's environmental liability under the Acquisition Agreement and Third Amendment in only one respect, limiting it to

---

[8] Greyhound also argued that all indemnification it is seeking in this case is based on environmental obligations related to contamination from UST leaks.

liabilities "identified" before March 1, 1992.

Eight years later, the parties' 1999 Settlement Agreement added some relevant definitions to the Agreements.  It defines "Environmental Obligations" as follows:

> The term "Environmental Obligations" shall mean any and all liabilities and obligations, whether statutory, regulatory, contractual, legal, financial or otherwise, relating to the physical or environmental condition of a Property (as defined below), including but not limited to the presence, use or release of Hazardous Materials (as defined below) at a Property, the migration of Hazardous Materials to or from a Property, the transportation of Hazardous Materials from a Property, or off-site disposal of Hazardous Materials which were kept, used or stored at a Property, regardless of whether such liability or obligation is predicated upon tort, contract, strict liability, warranty, Superfund . . . or any other state or federal statute, law, ordinance, or other basis of liability for damage to the environment.

Doc. 66-13 at 2.

This definition is important in two respects.  First, it appears to be as broad as the virtually unlimited obligations Viad assumed in the Acquisition Agreement.  Second, it is not limited to contamination from USTs.  If the parties understood at the time that Viad was responsible only for UST contamination, that fact presumably would have been included in this definition.  Viad notes, correctly, that Greyhound is the party primarily made responsible for Environmental Obligations in the Settlement Agreement, but that contract also imposes liability on Viad, and uses the phrase Environmental Obligations when defining Viad's liability, as will be shown below.

The Settlement Agreement also defined "Notified," a term of some importance in this litigation:

> [Viad] shall have been "Notified" about an Environmental Obligation only if: (a) the existence or nature of the Environmental Obligation has been reasonably disclosed in writing: (i) by Greyhound to [Viad], or (ii) by a state or federal environmental regulatory agency to [Viad], or (b) [Viad] has addressed or has been addressing such Environmental Obligations by way of site assessment, testing or remediation.

*Id.* at 2-3.

The Settlement Agreement then amends paragraph 14(a) of the Claims Treatment Agreement to make it consistent with these new definitions:

> [Viad] shall have no obligation to indemnify [Greyhound] for any liabilities for Environmental Obligations with respect to Properties, regardless of when the acts giving rise to liability occurred, and [Greyhound] shall assume all such Environmental Obligations and indemnities with respect to all Properties, except (A) indemnities arising from Environmental Obligations which [Viad was] Notified about prior to the Effective Date. The foregoing exception (A) shall continue to be governed by the Amended Acquisition Agreement[.] . . .  In addition, Greyhound shall indemnify [Viad] with respect to Environmental Obligations relating to Properties sold to [Greyhound] which [Viad was] not Notified about prior to the Effective Date.

*Id.* at 3.

The "Effective Date" in this provision is the cut-off date established in the Claims Treatment Agreement – March 1, 1992.  The Settlement Agreement thus preserves the temporal limitation on Viad's liability established in the Claims Treatment Agreement.  It also makes the cut-off more precise, stating that Viad must have been "Notified" of the liability by that date, as opposed to the Claims Treatment Agreement's provision that the liability merely needed to have been "identified" by that date.  But this contract does not limit the broad environmental liabilities that Viad assumed in the Acquisition Agreement, carried forward in the Third Amendment, and limited only temporally in the Claims Treatment Agreement.

The Court thus rejects Viad's argument that the language of the Agreements limits its liability to contamination from USTs.  As noted above, the parties provide additional evidence to support their respective interpretations of the language, but the Court finds that this evidence creates a factual dispute that precludes summary judgment.  The Court therefore will deny Viad's motion for summary judgment that asks the Court to adopt its narrow interpretation of the Agreements.  The Court expresses no view on whether

1   Greyhound's expansive reading of the Agreements is correct.[9]

2      Viad also presents factual evidence regarding the specific environmental liabilities

3   of which it received notice before March 1, 1992.  Viad asks the Court to hold that its

4   legal obligations are limited to these liabilities.  Greyhound presents controverting

5   evidence that raises a question of fact regarding the notices Viad received before the cut-

6   off date, precluding summary judgment.  In addition, Viad's arguments regarding the

7   import of this evidence assume that the Court agrees with its narrow reading of the

8   Agreements.  The evidence from both sides will need to be addressed in light of the

9   Court's conclusions set forth above.

10      **B.**    **Viad's Liability under CERCLA and MTCA.**

11      Both parties agree, and the Ninth Circuit has made clear, that private agreements

12   can allocate potential liability under CERCLA.  *Jones-Hamilton Co. v. Beazer Materials*

13   *& Servs., Inc.,* 973 F.2d 688, 692 (9th Cir. 1992).  As Greyhound notes, any responsible

14   party under CERCLA may be held liable to the government, but courts will enforce

15   contractual allocations of liability between private parties.  *Id.*  Similarly, Washington

16   courts have found that private parties may contractually allocate MTCA liability.  *See,*

17   *e.g., Car Wash Enterprises, Inc. v. Kampanos*, 874 P.2d 868, 873 (Wash. 1994).  Thus, it

18   appears clear that Viad's CERCLA and MTCA liabilities in this case will be controlled

19   by the limitations in the Agreements.  As a result, if all of Viad's liabilities under the

20   Agreements are subject to the step-down process, as Greyhound appears to concede,

21   Viad's indemnification responsibility for liabilities under CERCLA and MTCA will also

22   be subject to the step-down process.

23      The parties appear to disagree on two points: whether Viad can be held liable for

24

25      [9] The parties should consider Arizona's unique parol evidence rule when deciding

26   what evidence to present at trial.  The Arizona Supreme Court has adopted a more liberal
interpretation of the parol evidence rule than many courts.  "[T]he judge first considers

27   the offered evidence and, if he or she finds that the contract language is 'reasonably
susceptible' to the interpretation asserted by its proponent, the evidence is admissible to
determine the meaning intended by the parties."  *Taylor v. State Farm Mut. Auto. Ins.*

28   *Co.*, 854 P.2d 1134, 1140 (Ariz. 1993).  Arizona does not adhere to the view "that
ambiguity must exist before parol evidence is admissible."  *Id.*

anything other than UST contamination, and whether Viad received notice of specific instances of contamination before the March 1, 1992 cut-off date. The Court has found that Viad's position on the first issue cannot be justified solely on the language of the Agreements, and that additional evidence concerning the meaning of the Agreements must be considered at trial. The Court also finds that factual disputes prevent the Court from entering summary judgment on the second question – whether Viad received notice of specific instances of contamination before the cut-off date.

### C. Sale of the Seattle and Miami Properties.

Viad contends that purchase price reductions granted by Greyhound for the Seattle and Miami properties are not recoverable. Doc. 72 at 16-19. Citing the Third Amendment, Viad argues that its liability is limited to indemnification for "actual costs" of "remediation done." *Id.* But the Court, looking solely to the plain language of the text, has already found that the Third Amendment limited Viad's liability only by imposing a step-down process for UST contamination; it did not otherwise alter Viad's broad environmental obligations as established in the Acquisition Agreement. Those obligations, as defined more precisely in the Settlement Agreement, include "any and all liabilities and obligations, whether statutory, regulatory, *contractual*, legal, financial, or otherwise, relating to the . . . environmental condition of a Property." Doc. 66-13 at 2 (emphasis added). Because the price reductions granted by Greyhound might be viewed as a contractual liability relating to environmental conditions at the Seattle and Miami properties, the language of the Settlement Agreement may be broad enough to encompass Greyhound's reimbursement claim. The Court therefore cannot grant summary judgment on this issue. The precise scope of the Agreements in light of parol evidence, the precise nature of the price reductions granted by Greyhound on sale of the Seattle and Miami properties, and whether those reductions fit within the language of the Agreements, are matters that must be addressed at trial. Summary judgment cannot resolve this issue.[10]

_____

[10] Greyhound conceded in oral argument that the step-down process applies to the purchase price reductions. The Court finds this position confusing. On one hand, Greyhound is claiming that Viad's liability is defined by the broad language in the

1    Because Viad's CERCLA and MTCA liability will be limited by the Agreements,

2    there is no circumstance under which Greyhound can recover sums under these statutes

3    that exceed the agreed-upon limitations of the Agreements.  The Court therefore need not

4    decide whether the price reductions qualify as recoverable costs under CERCLA and the

5    MTCA.

6        **D.      Statute of Limitations.**

7        Viad argues that Greyhound's claim to recover the $5.95 million purchase price

8    reduction for the Seattle property is barred by the six-year statute of limitations in A.R.S.

9    § 12-548.  Doc. 72 at 19.  It is undisputed that Greyhound submitted a reimbursement

10   request for the Seattle price reduction on April 21, 2009.  On May 5, 2009, Ken Ries

11   responded to the request by asking: "[w]hat in the world is going on here?"  Doc. 73,

12   ¶ 50; Doc. 80 at 23.  Greyhound followed up on this request for reimbursement on

13   September 16, 2009 and June 3, 2010.  Doc. 66, ¶ 50; Doc. 89, ¶ 50.  There is some

14   dispute as to whether Viad responded to Greyhound's inquiries and whether Greyhound

15   provided requested information concerning the reimbursement.  Doc. 66, ¶¶ 47-70;

16   Doc. 89, ¶¶ 47-70.

17       Greyhound brought suit on September 11, 2015, some six years and five months

18   after the initial demand.  Doc. 73 at 51; Doc. 90 at 51.  Greyhound contends that it was

19   common for Viad to take several months to review and make payment in response to a

20   reimbursement request, and claims that it had no reason to know Viad was breaching its

21   agreement until at least June 2010 when Viad failed to respond to Greyhound's second

22   demand.  Doc. 66, ¶ 46.  Viad disputes that it routinely delayed payment (Doc. 89, ¶ 46),

23   but identifies no date on which it was required to pay a reimbursement request under the

24   Agreements.

25       The parties disagree on the nature of their course of dealing and when that course

26

27   Settlement Agreement.  On the other hand, Greyhound concedes that the same liability is
     subject to the step-down process in § 3.3 of the Third Amendment, even though that
28   section is limited to USTs.  The Court does not understand how that broad liability
     defined in the Settlement Agreement fits into § 3.3.  Evidence at trial concerning the
     parties' understanding and course of dealing hopefully will clear up the confusion.

should have alerted Greyhound to the fact that Viad was refusing to pay.  The Court concludes that a factual dispute precludes summary judgment on this issue.  As noted above, "[w]hen discovery occurs and a cause of action accrues are usually and necessarily questions of fact for the jury."  *Doe*, 955 P.2d at 961; *Walk*, 44 P.3d at 996.

**IT IS ORDERED:**

1.    Greyhound's motion for summary judgment (Doc. 64) is **granted** as to the fraud and misrepresentation claims, and **denied** as to all other claims.

2.    Viad's motion for partial summary judgment (Doc. 72) is **denied.**

3.    The Court will hold a status conference with the parties on **December 2, 2016, at 11:00 a.m.**  The purpose of the conference will be to determine the next step in this case and how best to bring it to resolution. The parties should confer before the conference to see if they can reach agreement on how best to proceed.

Dated this 21st day of November, 2016.

David G. Campbell
United States District Judge

- 24 -