**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Greyhound Lines Incorporated, | No. CV-15-01820-PHX-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Viad Corporation, | |
| Defendant. | |

Plaintiff Greyhound Lines, Inc. ("GLI") claims that Defendant Viad Corporation failed to satisfy contractual and statutory obligations to pay for environmental contamination at a property in Seattle, Washington. Doc. 30, ¶ 25. Viad asserts a counterclaim to recover money Viad paid GLI for environmental work at the property. Doc. 15 at 10. The Court held a six-day bench trial on May 3-5 and 10-12, 2017. Several witnesses testified and hundreds of exhibits were received in evidence. After reviewing the evidence carefully, the Court finds in favor of Viad on GLI's claims and in favor of GLI on Viad's counterclaims. This order sets forth the Court's findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure.

## I. Findings of Fact – Background.

On December 22, 1986, the parties entered into an Acquisition Agreement under which GLI purchased from Viad more than 100 parcels of real estate along with buses, maintenance equipment, and other assets needed to operate the Greyhound bus lines

business.  Ex. 1.  These assets included the property at issue in this case, 1250 Denny Way, Seattle, Washington (the "Property" or "Seattle Property").[1]

Viad owned and operated the Seattle Property as a bus garage from 1948 until it sold the property to GLI.   When GLI acquired the Property from Viad, it included 11 underground storage tanks ("USTs" or "tanks"):  three diesel fuel USTs (Tanks 1-3) on the west side of the maintenance building in the northwest part of the site; four USTs (Tanks 4-7) on the north side of the maintenance building in the northwest part of the site containing motor oil (Tank 4), antifreeze (Tank 5), water (Tank 6), and diesel fuel (Tank 7); one motor oil UST (Tank 8) to the west of the terminal building in the southwest part of the site; two waste oil USTs (Tanks 9-10) beneath the west end of the terminal building in the southwest part of the site; and one heating oil UST (Tank 11) east of the terminal building.  After the purchase, GLI continued to use the Property for bus maintenance purposes, including use of the 11 USTs.

The Acquisition Agreement between the parties was dated December 22, 1986, but the transaction did not close until March 18, 1987.  Before closing, three amendments to the Acquisition Agreement were signed by the parties.  The most relevant is the Third Amendment, which addressed possible contamination from leaking USTs at each of the properties GLI acquired from Viad.  Ex. 3.

The Third Amendment provided that Viad would be responsible for 100% of remediation expenses for contamination discovered by GLI during the first year after the sale, provided GLI gave notice to Viad and started site work related to the contamination during the first year.  *Id.*, § 3.3.  This liability would decrease to 80% for contamination discovered the following year (provided notice was given and work began), and by 20% each year thereafter, disappearing after five years.   *Id.*   The parties entered later agreements related to this liability that will be discussed below.

---

[1] Citations are to exhibits received in evidence during the trial (Ex.) and other documents filed in the docket (Doc.).  When docket pages are cited, the Court will use the page number attached to the top of each page by the Court's electronic filing system. The Court's findings of fact are based on all of the evidence received during the trial, regardless of whether cited in this order, including the Court's credibility determinations.

Between 1992 and 2009, GLI billed and Viad paid $588,719.54 related to contamination at the Seattle Property. Exs. 735, 736. Pursuant to the parties' agreement for decreasing Viad liability, these payments represented an allocation to Viad of 60% of environmental costs at the Property.

In 2007, GLI was acquired by FirstGroup plc. Doc. 124, ¶ 10. In 2008, GLI entered into a contract to sell the Property to the City of Seattle in lieu of condemnation. The sale was for a price of $31,755,200, but GLI and the City agreed that the price would be reduced by another $5.95 million to account for environmental contamination at the Property. The sale closed on March 13, 2009. The sale contract and related documents provided that the City would stop utilizing the Property as a bus garage and would convert it to a different use. After the sale, the City oversaw and paid for remediation and redevelopment of the site.

On September 11, 2015, GLI brought this case against Viad seeking declaratory and monetary relief for breach of contract. Doc. 30. Specifically, GLI claims that Viad is liable for 60% of the $5.95 million purchase price reduction GLI incurred when it sold the Property to Seattle. GLI also seeks to recover 60% of $46,050.85 GLI paid a consultant to investigate possible offsite sources of contamination after the sale closed. GLI further seeks to recover the full $5.95 million price reduction under the State of Washington's Model Toxics Control Act ("MTCA"), and $196,350 for hazardous substance remediation under the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA").

Viad claims that it learned during this lawsuit that GLI had improperly billed it for $547,177 in environmental costs at the Seattle Property – costs for which it is not liable. Viad seeks to recover this amount for breach of contract.

## II. GLI's Contract-Related Claims.

### A. Conclusions of Law – Legal Standards.

The contracts at issue in this case are governed by Arizona law. Doc. 124. The parties entered into the following stipulations regarding the relevant law. *Id.*

1.      GLI and Viad entered into the Acquisition Agreement as amended by the Third Amendment, the Claims Treatment Agreement, and the Settlement Agreement, each of which is a valid and binding contract.

2.      For GLI to recover from Viad for breach of contract, GLI must establish by a preponderance of the evidence that (1) GLI and Viad entered into a valid and binding contract, (2) GLI satisfied conditions precedent under the contract, (3) Viad materially breached the contract, and (4) the breach resulted in damage to GLI.

3.      For GLI to recover for breach of the implied covenant of good faith and fair dealing, GLI must establish that (1) GLI and Viad are parties to a valid and binding contract, (2) Viad prevented GLI from receiving the benefits of the contract, and (3) GLI suffered damages as a direct and proximate result. *United Dairymen of Arizona v. Schugg*, 128 P.3d 756, 762 (Ariz. Ct. App. 2006).

4.      "[I]n Arizona, a court will attempt to enforce a contract according to the parties' intent." *Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1138 (Ariz. 1993).

5.      Arizona does not adhere to the view "that ambiguity must exist before parol evidence is admissible." *Id.* at 1140. Rather, "the judge first considers the offered evidence and, if he or she finds that the contract language is 'reasonably susceptible' to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties." *Id.*

6.      "The acts of parties under a contract, before disputes arise, are the best evidence of the meaning of doubtful contract terms." *Associated Students of the Univ. of Ariz. v. Arizona Bd. of Regents*, 584 P.2d 564, 569 (Ariz. Ct. App. 1978).

**B.      Findings of Fact.**

**1.      The Relevant Contracts.**

The Acquisition Agreement signed in 1986 makes Viad liable for "any claim, action, proceeding, damage, liability, loss, cost, expenses, judgment, fine, penalty or deficiency . . . arising out of, resulting from or related to . . . [a]ny liability or obligation

of [Viad]." Ex. 1, § 10.2. GLI has not shown that this agreement imposed any environmental liabilities on Viad. Bill Halliman, a former in-house attorney at Viad and the lead lawyer for Viad in formation of the Acquisition Agreement, testified that all properties were sold to GLI "as is." Section 4.7 of the agreement confirms this fact, stating that the "Sale Assets" are sold "in an as is" condition.[2] Ex. 1, § 4.7. This was done, Halliman explained, so that environmental liabilities would transfer to GLI with the properties. GLI has identified no portion of the 64-page Acquisition Agreement that says anything about Viad retaining environmental liabilities. Indeed, the parties paid little attention to the Acquisition Agreement during trial, instead focusing their attention on the Third Amendment.

GLI claims that Viad is liable for breaching § 3.3 of the Third Amendment. GLI claims that Viad is liable for 60% of environmental liabilities incurred at the Property, a percentage limit set in the Third Amendment for contamination discovered during the third year after the sale.[3]

The Third Amendment was entered on March 18, 1987, three months after the Acquisition Agreement. Ex. 3. Bill Halliman testified without contradiction that the Third Amendment's environmental provisions arose because, during the three months after signing the Acquisition Agreement, GLI and its lenders became concerned that USTs on the properties could give rise to environmental liabilities. Article III of the Third Amendment therefore established a procedure for the parties to share this environmental risk in a way both sides found acceptable. Halliman testified credibly that Article III was not intended to include environmental liabilities other than leaks from USTs. Ken Ries, Viad's in-house environmental manager who was responsible for

---

[2] "Sale Assets" is defined in the Acquisition Agreement to include all assets GLI acquired in the transaction, including real estate. Ex. 1, § 1.3.

[3] Consistent with the parties' lack of attention to the Acquisition Agreement during trial, the evidence showed that the parties' entire focus during more than 25 years of dealings with respect to the Seattle Property centered on the reimbursement procedures in the Third Amendment. The Court accordingly finds that the Third Amendment, as refined by later agreements and the parties' course of dealing, is the controlling agreement in this case.

administering the Third Amendment for more than 25 years, also understood that Article III applied only to UST leaks.

The language of the Third Amendment is consistent with the testimony of Halliman and Ries. Section III is titled "Environmental Matters" and states that "the Parties desire to make certain arrangements with respect to certain underground storage tanks on properties [covered by the Acquisition Agreement]." *Id.*, § 3.1. Section 3.3 provides that, "[n]otwithstanding any provision of the Acquisition Agreement to the contrary, [Viad] shall be obligated to bear a proportionate share of any costs, fees, expenses, fines, penalties and governmental levies associated with remediation done in respect of leaks from the Tanks, and the actual costs or expenses of remediation of the properties where the Tanks are located . . . (collectively, the 'Remediation Expenses')." *Id.*, § 3.3. "[Viad's] proportionate share" for these UST expenses "shall be 100% of the Remediation Expenses for a period of one year after the Closing Date, and shall decrease linearly 20% every year thereafter, such that the Seller is not responsible for any Remediation Expenses from and after five years after the Closing Date." *Id.* The Third Amendment thus included a step-down process under which Viad's liability for UST remediation decreased each year, reaching zero after five years. Section 3.3 places on GLI "the remaining share of the Remediation Expenses." *Id.*

In August 1991, the parties entered into the Claims Treatment Agreement. Ex. 4. Section 14(a) provides that "[t]he environmental indemnities in the Acquisition Agreement" – which is defined to include the Third Amendment – "shall be modified as follows: [Viad] shall have no obligation to indemnify [GLI] for any liabilities for environmental matters or claims, regardless of when the acts giving rise to liability occurred, and [GLI] shall assume all such environmental obligations and indemnities, except . . . indemnities arising from liabilities which are identified prior to March 1, 1992." Ex. 4, § 14(a). The Claims Treatment Agreement further provides that the liabilities identified before March 1, 1992 "shall continue to be governed by the Acquisition Agreement" (*id.*), as amended by the Third Amendment (*id.*, Recital A).

Thus, the Claims Treatment Agreement makes clear that Viad's environmental liability under the Third Amendment applies only to liabilities identified before March 1, 1992.

Eight years later, the parties entered into a Settlement Agreement that added relevant definitions. Ex. 5. The Settlement Agreement defines "Environmental Obligations" as follows:

> The term "Environmental Obligations" shall mean any and all liabilities and obligations, whether statutory, regulatory, contractual, legal, financial or otherwise, relating to the physical or environmental condition of a Property (as defined below), including but not limited to the presence, use or release of Hazardous Materials (as defined below) at a Property, the migration of Hazardous Materials to or from a Property, the transportation of Hazardous Materials from a Property, or off-site disposal of Hazardous Materials which were kept, used or stored at a Property, regardless of whether such liability or obligation is predicated upon tort, contract, strict liability, warranty, Superfund . . . or any other state or federal statute, law, ordinance, or other basis of liability for damage to the environment.

*Id.*, § 2.1.

The Settlement Agreement defines "Notified" as follows:

> [Viad] shall have been "Notified" about an Environmental Obligation only if: (a) the existence or nature of the Environmental Obligation has been reasonably disclosed in writing: (i) by [GLI] to [Viad], or (ii) by a state or federal environmental regulatory agency to [Viad], or (b) [Viad] has addressed or has been addressing such Environmental Obligations by way of site assessment, testing or remediation.

*Id.*, § 2.4.

The Settlement Agreement then revised § 14(a) of the Claims Treatment Agreement to make it consistent with these new definitions:

> [Viad] shall have no obligation to indemnify [GLI] for any liabilities for Environmental Obligations with respect to Properties, regardless of when the acts giving rise to liability occurred, and [GLI] shall assume all such Environmental Obligations and indemnities with respect to all Properties, except (A) indemnities arising from Environmental Obligations which [Viad was] Notified about prior to the Effective Date. The foregoing exception (A) shall continue to be governed by the Amended Acquisition Agreement[.] . . . In addition, [GLI] shall indemnify [Viad] with respect to

Environmental Obligations relating to Properties sold to [GLI] which [Viad was] not Notified about prior to the Effective Date.

*Id.*, ¶ 3.1.

The "Effective Date" is the cut-off date established in the Claims Treatment Agreement – March 1, 1992. The Settlement Agreement made the cut-off more precise by stating that Viad must have been "Notified" of the liability by March 1, 1992, as opposed to the Claims Treatment Agreement's provision stating that the liability merely needed to be "identified" by that date.

### 2. The Parties' Interpretations and Arguments.

GLI argues that the Third Amendment makes Viad liable for the relevant percentage of all remediation costs at properties where GLI gave the required notice. GLI asserts that it gave notice and triggered Viad's liability for subsurface contamination at the Seattle Property in 1989, making Viad liable for 60% of the remediation costs GLI billed to Viad between 1990 and 2009, as well as 60% of the price reduction GLI agreed to when the property was sold to the City of Seattle.

Viad disagrees, arguing that three steps had to occur before its liability was triggered under the Third Amendment as modified by the later agreements: (1) GLI had to give reasonable written notice to Viad, (2) a UST leak had to be confirmed at the Property, and (3) GLI had to commence remediation activities at the Property with respect to that leak. Although Viad agrees that these steps occurred in 1989 and 1990 for relatively minor diesel vapor leak at the Seattle Property, it claims that GLI failed to give it notice of the more substantial contamination that resulted in the post-1992 costs for which Viad was billed and the $5.95 million sale price reduction.

Before addressing the parties' respective arguments, the Court will describe some additional facts that bear on interpretation of the agreements.

On June 12, 1989, GLI wrote to Viad and stated that it had "identified hydrocarbon contamination in the soil and groundwater at the [Seattle] facility." Ex. 15. GLI argues that this letter triggered Viad's liability for 60% of all future environmental

costs at the Property.[4]  The letter further stated:  "We have notified the State and have obtained a proposal from ENSR to conduct a site assessment and develop an assessment report[.]  The cost of the assessment has been estimated at $18,644 and should be 60% reimbursable *provided a leaking system is confirmed*."  *Id.* (emphasis added).  An attachment to the letter noted that three soil borings had been completed at the property and had encountered petroleum "sheen" in one boring and petroleum sheen and odor in another.  *Id.*  Two days later, Ken Ries responded that Viad "would have a 60 percent allocation *if leaking is confirmed*."  Ex. 261 (emphasis added).  The emphasized language in these two letters reflects the parties' understanding that Viad was liable only if a leaking UST was confirmed.

The site assessment commissioned by GLI was conducted in August 1989 and found total petroleum hydrocarbon ("TPH") contamination in soil and groundwater at the site, but did not confirm a leaking UST.  Ex. 35.  There is no evidence that the site assessment was provided to Viad, and Ken Ries testified that he never saw it before this litigation.  Viad's internal invoice summaries show that Viad was never asked to pay for this site assessment work.  Ex. 735.  This comports with the fact that Viad had no liability for contamination at the site until a leak from a UST was confirmed.

In March 1990, GLI had a Tracer tank tightness test performed at the Property.  The test found vapor leaks in an antifreeze UST (Tank 2) and a diesel fuel UST (Tank 7) in the northwest portion of the Property.  Ex. 595.  Consistent with the view that notice and a leak were not enough – that remediation activities also had to begin before Viad's liability attached – GLI scrambled to get a consultant on the property before March 18, 1990, the end of the third year during which a 60% allocation could be assigned to Viad.  *See* Ex. 172.  Indeed, an internal GLI document explained that "the emergency response was needed to secure a 60% reimbursement from [Viad].  A delay would have allowed

---

[4] GLI agrees that Viad is not responsible for contamination GLI caused at the Property, such as through a fuel spill, but otherwise contends that the June 12, 1989 letter triggered Viad's liability for all subsurface contamination later found at the site.

the reimbursement to drop to 40%." Ex. 600.[5] GLI sent Viad a letter dated March 15, 1990, advising it of the tank leaks. Ex. 17. On July 9, 1990, Viad responded and accepted a 60% allocation. Ex. 20.

### 3. Scope of the Agreements.

GLI argues that a written notice under the Third Amendment made Viad liable for all contamination at a property, not just contamination related to a specific leaking UST. In support, GLI relies on the following sentence from § 3.3: "Notwithstanding any provision of the Acquisition Agreement to the contrary, [Viad] shall be obligated to bear a proportionate share of any costs, fees, expenses, fines, penalties and governmental levies associated with remediation done in respect of leaks from the Tanks, *and* the actual costs or expenses of remediation of the properties where the Tanks are located . . . (collectively, the 'Remediation Expenses')." *Id.*, § 3.3 (emphasis added). GLI sees two categories of costs in this language: (1) "remediation done in respect of leaks from the Tanks," and (2) "the actual costs or expenses of remediation of the properties where the Tanks are located." GLI suggests that the second category includes more than remediation of UST leaks – remediation of the larger property is covered as well.

Viad responds that the two categories of liabilities in § 3.3 should be read this way: (1) "costs, fees, expenses, fines, penalties and governmental levies associated with remediation done in respect of leaks from the Tanks," and (2) "the actual costs or expenses of remediation of the properties where the Tanks are located." The first category would include costs that arise from the fact that a UST is leaking, such as fines, fees, or penalties from government regulators, while the second would include actual remediation costs caused by the UST leak. Viad argues that both of these categories must be linked to a UST leak.

---

[5] The relevant date for the percentage step-down process – March 18 – arose from the fact that the Acquisition Agreement closed, and GLI became the legal owner of the properties acquired from Viad, on March 18, 1987. Ex. 3, § 3.1. The annual 20% reduction in Viad's liability occurred on the anniversary of this acquisition date. *See* Ex. 5, ¶ 2.1; Exs. 501-503.

As noted above, "in Arizona, a court will attempt to enforce a contract according to the parties' intent." *Taylor*, 854 P.2d at 1138. Arizona does not adhere to the view "that ambiguity must exist before parol evidence is admissible." *Id.* at 1140. Rather, "the judge first considers the offered evidence and, if he or she finds that the contract language is 'reasonably susceptible' to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties." *Id.* "The acts of parties under a contract, before disputes arise, are the best evidence of the meaning of doubtful contract terms." *Associated Students*, 584 P.2d at 569. The Court has considered the parol evidence offered by both parties and finds Viad's evidence most persuasive and the language of § 3.3 most susceptible to Viad's interpretation.

As noted above, GLI and Viad agreed in correspondence that Viad's liability at the Seattle Property would not arise until a UST leak was confirmed. Exs. 15, 261. If Viad had been liable for environmental contamination at the property regardless of UST leaks, as GLI now contends, then confirmation of a UST leak would have been unnecessary. And yet GLI expressly stated in its notice that Viad would be liable for 60% of cleanup costs "provided a leaking system is confirmed." Ex. 15. Viad responded that it would have a 60 percent allocation "if leaking is confirmed." Ex. 261. Communications between the parties regarding other properties are consistent with this understanding. *See* Exs. 577, 579 (GLI advising Viad of a "tank system failure" at the Portland property and suggesting a 20% allocation, and Viad responding that it "assumes a 20 percent allocation of the cost of remediation work in connection with the leak"); Ex. 17 (GLI letter identifying properties where "UST Systems Identified as Leakers").

Viad's interpretation is confirmed by other evidence. Bill Halliman – who was involved in the creation of the Third Amendment – testified that the Third Amendment was a way for GLI and Viad to share the risks of leaking USTs at the properties sold to GLI, but was never intended to cover environmental contamination other than tank leaks. Ken Ries also testified that Viad's liability arose under the Third Amendment only when a tank leak was confirmed.

Viad's interpretation is further supported by the fact that the environmental provisions of the Third Amendment arose from a specific issue – concern about UST contamination at the properties. Section 3.1 states that "[t]he Parties desire to make certain arrangements with respect to certain underground storage tanks on properties owned by GLI[.]" Ex. 3, § 3.1. Section 3.2 makes clear that GLI is responsible for "testing, repairing or replacing any of the Tanks." *Id.*, § 3.2. Section 3.3 establishes the parties' respective responsibilities for contamination resulting from the tanks – for "remediation done in respect of leaks from the Tanks." *Id.*, § 3.3.

Given this evidence, the Court cannot accept GLI's argument that Viad was responsible for all contamination at a property where GLI gave notice of a liability, regardless of whether the contamination related to a UST leak. The contract context and language, the parties' communications and course of dealing, and the testimony of individuals involved in the drafting and implementation of the Third Amendment all show that Viad was liable only for environmental contamination tied to a UST leak of which it was notified.[6]

GLI makes a second argument from the language of § 3.3 of the Third Amendment. It notes that § 3.3 refers to Viad's proportionate share of the cost "with respect to *any Tank location*." *Id.* (emphasis added). GLI argues that the word "location" shows that Viad's duties applied to "locations" – to properties where tanks were located – not just to areas of immediate releases from tanks. This argument is not

---

[6] To be sure, GLI presented evidence to the contrary in the form of testimony and exhibits. But the Court finds the testimony of Viad's witnesses, particularly Mr. Ries and Mr. Halliman, more credible. This is due in part to the fact that they, unlike the GLI witnesses, were on scene when the relevant contracts were negotiated, documented, and implemented, and due in part to their general demeanor and believability while testifying. GLI's witnesses were less believable during their testimony. The Court also finds that a preponderance of the documentary evidence favors Viad's position even though some exhibits can be read to support GLI's view. One might reasonably ask how Viad's liability was limited to UST leaks when the definition of "Environmental Obligations" in the Settlement Agreement is much broader. The definition is indeed broad, but the Settlement Agreement specifically states that Viad's liabilities "continue to be governed by the Amended Acquisition Agreement" (Ex. 5, § 3.1(a)), which includes the Third Amendment (*id.*, § 1.2). Thus, the Third Amendment, which was limited to UST leaks for all the reasons identified above, remained the controlling agreement.

persuasive. The relevant sentence reads as follows: "the proportionate share of Remediation Expenses to be paid by [Viad] with respect to any Tank location shall be determined upon the earlier of (a) such time as GLI . . . undertakes . . . remediation" or (b) a government agency gives notice to Viad. Ex. 3, § 3.3 (emphasis added). If "location" means an entire property as GLI contends, then Viad's percentage of liability for a particular property would be fixed when GLI first provided notice of contamination and would remain in place for all subsequent contamination found at the property. And yet the parties clearly did not follow such an approach. In a letter to Viad dated January 24, 2000, GLI noted that the Cleveland property included "a 40% reimbursement allocation for work connected to the waste oil release" and a 100% allocation for ongoing "remediation activities . . . related to the original release of diesel fuel in the 1980s." Ex. 220. This shows that Viad's liability varied as different UST leaks were found. Viad did not become liable for all contamination at a property when the first contamination was found. The words "Tank location" in § 3.3 thus mean the area affected by the leaking tank.

In summary, the Court finds and concludes that Viad's liability under the Third Amendment is limited to leaks from USTs.

### 4. Steps to Trigger Liability.

Viad contends that three steps were required to trigger its liability. The Court agrees. First, GLI had to give reasonable written notice of the UST contamination to Viad. The notice requirement appears in § 3.3 of the Third Amendment and was later refined in the Settlement Agreement. That agreement provided that GLI was responsible for "all Environmental Obligations with respect to all Properties, except for Environmental Obligations which [Viad was] Notified about prior to [March 1, 1992]." Ex. 5, §§ 2.5, 3.1. "Notified" was defined to require that "the existence or nature of the Environmental Obligation has been reasonably disclosed in writing."[7] Id., § 2.4. Thus,

---

[7] The full definition of "Notified" also includes notice to Viad by a state or federal regulators or Viad's performance of site assessment, testing, or remediation work at a property. Id., § 2.4. GLI does not argue that Viad received notice by these means.

Viad's liability for an Environmental Obligation arose only if GLI provided reasonable written notice before March 1, 1992.

Second, a UST leak had to be confirmed. The Third Amendment provided that Viad was liable for "remediation done in respect of leaks from the Tanks" (Ex. 3, § 3.3), and, as discussed above, the parties' course of dealing made clear that a tank leak had to be confirmed before Viad was liable for any share of the site costs  (Exs. 15, 261; *see also* Exs. 577, 579; Testimony of Ries and Halliman).

Third, GLI had to commence remediation activities. The Third Amendment stated that Viad's liability "shall be determined upon the earlier of (a) s*uch time as GLI . . . undertakes, or requests [Viad] to undertake, such remediation . . .* or (b) upon notification of GLI . . . by any governmental entity of the probable imposition of any fines, penalties or governmental levies or the demand to remediate the property or repair or replace the Tanks." Ex. 3. § 3.3 (emphasis added). The parties presented no evidence that the second condition – a government enforcement action – occurred at the Seattle Property, so the relevant requirement was the commencement of remediation work at the site. The fact that GLI understood this prerequisite is shown by its scramble to start work at the Seattle Property before the end of the 60% contribution year. Ex. 172, 600.

**5.**     **Did GLI Trigger Viad's Liability for All Seattle Contamination?**

GLI contends that its June 12, 1989 letter notifying Viad of hydrocarbon contamination at the Seattle Property was sufficient to trigger Viad's 60% liability for all subsurface contamination later found at the Property, even if some of that contamination was found after the cut-off date of March 1, 1992. For several reasons, the Court does not agree.

First, § 14(a) of the Claims Treatment Agreement, as modified by the Settlement Agreement, provides that "[Viad] shall have no obligation to indemnify [GLI] for any liabilities for Environmental Obligations with respect to Properties, regardless of when the acts giving rise to liability occurred, and [GLI] shall assume all such Environmental Obligations and indemnities with respect to all Properties, except (A) indemnities arising

- 14 -

from Environmental Obligations which [Viad was] Notified about prior to [March 1, 1992]." Ex. 5, ¶ 3.1. This provision places primary responsibility for Environmental Obligations on GLI, and limits the obligations of Viad to those of which it was notified before March 1, 1992. Nothing in § 14(a) suggests that Viad is liable for Environmental Obligations for which it received no notice, provided those obligations arose at a property where Viad had been notified of other Environmental Obligations before the deadline.

The Seattle Property had several different kinds of contamination, including diesel fuel, gasoline, lube oil, hydraulic oil, waste oil, and chlorinated solvents, in different but sometimes overlapping plumes. *See* Ex. 295, Fig. 9. These plumes represent different releases from different sources at the site. The Court cannot read § 14(a) to mean that if Viad was on notice for one of these Environmental Obligations it was on notice for all – a kind of "in for a penny, in for a pound" requirement. Such an interpretation runs contrary to the provision's careful placement of primary environmental responsibility on GLI, with the sole exception being Viad's liability for Environmental Obligations of which it received notice by March 1, 1992. Viad received no notice before that date of gasoline, lube oil, hydraulic oil, waste oil, or chlorinated solvent contamination, as will be discussed in more detail below.

Second, if notice of one kind of contamination at a property was sufficient to make Viad liable for all kinds of contamination at the property, then a single percentage under the Third Amendment would apply at each property. In fact, that is what GLI claims in this case – that its June 12, 1989 notice locked Viad into a 60% allocation for all contamination eventually found at the Seattle Property. As noted above, however, GLI's letter to Viad regarding the Cleveland property noted "a 40% reimbursement allocation for work connected to the waste oil release" and a 100% allocation for ongoing "remediation activities . . . related to the original release of diesel fuel in the 1980s." Ex. 220. This letter disproves GLI's position. Notice of the diesel contamination at the Cleveland property did not lock in a 100% allocation for all contamination eventually found at the property. The waste oil contamination was subject to a 40% allocation when

it was discovered and properly noticed. Ken Ries confirmed this understanding of the Cleveland letter during his testimony.[8]

Third, GLI did not complete the steps needed to trigger Viad's liability for most of the contaminants at the Seattle Property. Not only did GLI fail to give written notice of the other contaminants before the cut-off date, but written notice was only one of three required steps. A leaking UST also had to be confirmed. Exs. 15, 261; 577, 579; 17. Evidence at trial demonstrated that gasoline, lube oil, hydraulic oil, and chlorinated solvents were never tied to any specific UST leak. Waste oil was found in the vicinity of the waste oil Tanks 9 and 10, but GLI presented no evidence that those tanks were confirmed to be leaking, and surface activities in the vicinity of the tanks very well could have caused the contamination. Indeed, chlorinated solvents – which Mr. Jewitt said were likely related to the waste oil – were found in soil *above* the tanks, suggesting surface releases.

In addition, remediation work had to begin at a property before Viad's liability would attach. *See* Ex. 3, § 3.3; Exs. 172, 600; *see also* Ex. 513 (letter from Viad to GLI stating that "the allocation percentage is assignable upon undertaking remediation or being required by the state to undertake remediation, and not by the discovery of the problem itself"). And yet remediation work related to gasoline, lube oil, hydraulic oil, waste oil, and chlorinated solvents did not begin at the Seattle Property until after the liability cut-off date of March 1, 1992.

Fourth, the parties understood that contamination from sources other than UST leaks could not be assigned to Viad. Bill Halliman and Ken Ries testified credibly that this was the parties' understanding and course of dealing, and the language and context of the Third Amendment confirm this understanding. *See also* Exs. 501-503. GLI failed to present evidence that gasoline, lube oil, hydraulic oil, waste oil, or chlorinated solvent contamination at the site resulted from UST leaks.

---

[8] The parties did place documents in evidence that show a single percentage applying to various properties, but GLI presented no evidence that any of those properties included more than one kind of Environmental Obligation or more than one release.

In sum, the Court cannot accept GLI's claim that the June 12, 1989 letter regarding general hydrocarbon contamination triggered Viad's liability for 60% of all subsurface contamination eventually found at the Seattle Property.[9]

### 6. Nature and Timing of the Seattle Contamination.

The June 12, 1989 letter mentioned only "hydrocarbon contamination in the soil and groundwater." Ex. 15. It did not tie the contamination to any leaking UST. *Id.* In March 1990, GLI had a Tracer tank tightness test performed. The test found vapor leaks in an antifreeze UST (Tank 2) and a diesel UST (Tank 7) in the northwest portion of the Property. Ex. 595. In a March 15, 1990 letter to state regulators, GLI characterized these leaks as "a vapor leak, or a small or intermittent leak." Ex. 597. In a letter the same day to Viad, GLI identified the leaks as relating to diesel and antifreeze tanks. Ex. 17. In response, Viad accepted responsibility for 60% of the costs associated with the leaks. Ex. 20. The parties agree that the antifreeze leak did not create contamination at the Seattle Property that required any cleanup efforts.

In January 1992, Tracer performed another UST test at the Seattle Property. Tank 7, which had shown only a vapor leak in 1990, failed the 1992 test. Ex. 607. GLI notified state regulators of this failure and stated that it would immediately take Tank 7 out of service, but GLI never notified Viad. Ken Ries testified that he never saw a copy of the UST failure report before this litigation began. The 1992 failure appears to have been much more substantial than the 1990 vapor leak because GLI also discovered significant diesel contamination in the area of Tank 7 in 1992, including "free product," which is pure diesel fuel in the soil or floating on the groundwater.

---

[9] Former GLI in-house attorney Michael Crim testified at trial on the basis of his own knowledge. Viad objected to much of this personal testimony on the ground that Crim invoked the attorney-client privilege during his deposition and declined to provide information he later provided at trial (as opposed to his Rule 30(b)(6) testimony, which was given in deposition and to which Viad does not object). Near the end of trial, the parties provided the Court with their respective written positions on which of Mr. Crim's answers were appropriate. Because the Court finds that Mr. Crim's testimony does not alter the decision in this case even if all of it is considered, the Court need not undertake a question-by-question ruling on what answers were appropriate.

Thus, before the liability cut-off date of March 1, 1992, GLI notified Viad of a vapor leak in one diesel tank. GLI did not inform Viad of the more substantial diesel tank failure in 1992.

The Court finds that GLI was not aware of other kinds of contamination at the site before March 1, 1992. A letter to state regulators dated February 27, 1992 explained that GLI had "conducted a comprehensive site assessment to define the extent of soil and groundwater contamination," and yet reported only diesel contamination. Ex. 607. In a letter to Viad later that year, GLI said that it had been "actively pursuing soil and groundwater clean-up efforts" at the Seattle Property, and had defined "the vertical and horizontal parameters of the contamination." Ex. 275. Again, the letter mentioned only diesel contamination. Other kinds of contamination were discovered later.

Lube Oil. Lube oil was present in soil at the Property when it was sold to the City of Seattle in 2009. Ex. 295, Fig. 9. GLI's environmental expert, Peter Jewitt, testified that the lube oil was not discovered before March 1, 1992, and GLI has stipulated that it did not notify Viad of lube oil contamination before that date. Doc. 124, ¶ 24.

Hydraulic Oil. Hydraulic oil was also present in soil at the Property when it was sold to the City. Ex. 295, Fig. 9. GLI presented no evidence that this contamination was discovered before March 1, 1992, and GLI's expert stated no opinion on when hydraulic oil was first released or discovered.

Waste Oil. Waste oil was present in soil at the Property when it was sold to Seattle. Ex. 295, Fig. 9. GLI did not identify waste oil contamination at the site until the summer of 1992 when it closed Tanks 9 and 10 at the Property. Exs. 276, 48. The Court cannot find that the waste oil was discovered by earlier tests that simply reflect undifferentiated petroleum contamination at the site. Viad's expert witness, Thomas Schruben, testified that waste oil contamination was not found at the site until the waste oil tanks were closed in mid-1992, after the liability cut-off date. And remediation of the waste oil did not begin until September 1993. Ex. 50. GLI introduced no evidence of any notice to Viad regarding waste oil contamination before the cut-off date.

Gasoline. A large plume of gasoline contamination was present at the Property when it was sold to Seattle. Ex. 295, Fig. 9. The Court finds that this contamination was not discovered by GLI until 2008. The gasoline contamination was first found in a site assessment conducted by consultants for the City of Seattle that year. Ex. 295. An internal GLI document written in 2009 stated that the gasoline contamination was first discovered in 2008. Ex. 666 at 1. The same document observed that "[i]t is the remediation of carcinogenic compounds found in gasoline which is driving the cost of future remediation for this site." *Id.* Further, GLI's environmental consultant, ATC, stated in a Rule 30(b)(6) deposition that it tested for known contaminants at the site, but that it did not test for gasoline in 2007, suggesting that gasoline was not a known contaminant of the Property in 2007.

The Court also finds that GLI did not give Viad notice of gasoline contamination at the site before March 1, 1992. The Court cannot accept GLI's argument that the mention of BTEX in some environmental reports provided notice to Viad of the gasoline contamination. As Ken Ries and expert Thomas Schruben testified, BTEX is also found in diesel fuel, which for years was the primary contaminant of concern at the Property. GLI's expert, Peter Jewitt, opined that BTEX found at the site was indicative of gasoline, but ATC, GLI's on-site consultant, testified in a Rule 30(b)(6) deposition that it knew of the BTEX at the site but was not aware of gasoline contamination. The Court finds that detections of BTEX did not put Viad on notice of gasoline contamination.[10]

Chlorinated Solvents. TCE, TCA, and PCE were detected at the Seattle Property, but not before March 1, 1992. PCE and TCA were detected when the waste oil tanks

---

[10] The parties spent time during trial addressing possible sources of the gasoline contamination. GLI and Viad witnesses testified that neither company used gasoline at the site. A report of the City's consultant noted that gasoline tanks had been used at the facility in the 1930s and 1940s, before Viad's operations. Ex. 666 at 1. GLI's internal communications also noted the existence of possible off-site sources. *Id.* The Court finds, however, that the source of the gasoline contamination is irrelevant. The contracts made GLI liable for all contamination, from whatever source, unless it took the three steps outlined above before March 1, 1992. The Court finds that GLI did not take those steps with respect to gasoline. (The Court notes that it did not rely on Ex. 303 – the admissibility of which was hotly contested at trial – in reaching this conclusion or any conclusion in this case.)

1   were closed in July 1992. Ex. 276. TCE was detected in low concentrations during field

2   work in September and October 1993. Ex. 50. Remediation of the area where PCE and

3   TCA were found began in September 1993. *Id.* GLI introduced no evidence that it ever

4   advised Viad of chlorinated solvent contamination at the Property.[11]

5              **7.     Contract-Related Findings.**

6              The Court finds that GLI did not discover the gasoline, lube oil, hydraulic oil,

7   waste oil, or chlorinated solvent contamination before March 1, 1992, did not give notice

8   of that contamination to Viad before the deadline, did not link the contamination to a

9   leaking UST, and did not begin remediating the contamination before the deadline. Viad

10  therefore is not liable under the Third Amendment and the other agreements for this

11  contamination.

12             Diesel contamination is more complicated. GLI gave Viad notice of a vapor leak

13  in a diesel tank and started remediation work before March 1, 1992, leading to Viad's

14  acceptance of 60% liability. But GLI did not give Viad notice of the larger diesel leak

15  discovered in 1992, although it did mention free product remediation in a letter to Viad

16  that year, as discussed below. The Court finds that this was not reasonable written notice

17  of the larger tank leak before the deadline, and that GLI cannot recover remediation costs

18  related to that larger leak. But even if the Court were to find that GLI took the steps

19  necessary to trigger Viad's liability for all diesel contamination at the site, GLI has

20  provided no basis for the Court to determine what portion of the $5.95 million price

21  reduction was due to diesel contamination as opposed to other forms of contamination.

22  The Court therefore could not award GLI damages for the diesel remediation alone.[12]

23             In short, GLI cannot prevail on its claim for breach of contract. GLI has not

24  shown that it satisfied conditions precedent under the contracts. The Court also finds that

25  _____

26             [11] The Court cannot accept Peter Jewitt's suggestion that notice of hydrocarbon

27  contamination near the waste oil tanks somehow constituted notice of chlorinated solvent
    contamination.

28             [12] Nor does GLI assert that any portion of the additional $46,050.85 it seeks to
    recover was due to diesel contamination.

because GLI did not take the steps necessary to trigger Viad's liability under the contracts, Viad did not prevent GLI from receiving the benefits of those contracts. GLI therefore cannot prevail on its claim for breach of the covenant of good faith and fair dealing. In light of these rulings, the Court need not reach Viad's statute of limitations defense.

**III.    GLI's CERCLA and MTCA Claims**.

GLI seeks to recover the full $5.95 million price reduction under the MTCA, and $196,350 for chlorinated solvent contamination under CERCLA (CERCLA does not cover petroleum contamination). Both parties agree, and the Ninth Circuit has confirmed, that private agreements can allocate liability under CERCLA. *Jones-Hamilton Co. v. Beazer Materials & Servs., Inc.*, 973 F.2d 688, 692 (9th Cir. 1992) ("enforcement of the indemnification agreement would not violate public policy under CERCLA"). Although any responsible party may be liable to the government under CERCLA, courts will enforce contractual allocations of liability between private parties. *Id.* Similarly, Washington courts have found that private parties can contractually allocate MTCA liability. *See Car Wash Enterprises, Inc. v. Kampanos*, 874 P.2d 868, 873 (Wash. 1994) (MTCA does not "prohibit private parties from allocating MTCA clean up liability between themselves").

The Court finds that GLI's claims under CERCLA and the MTCA are foreclosed by the parties' contracts. After setting forth the procedure under which Viad can be made liable for a percentage of remediation expenses, the Third Amendment states: "[GLI] shall be obligated to bear the remaining share of the Remediation Expenses." Ex. 3, § 3.3. This would include a 100% share after March 1, 1992. *Id.*

The Settlement Agreement is even clearer. It defines "Environmental Obligations" to include CERCLA and "any other state or federal statute," which would include the MTCA. Ex. 5, § 2.1. The Settlement Agreement then provides:

> [Viad] shall have no obligation to indemnify [GLI] for any liabilities for Environmental Obligations with respect to the Properties, regardless of when the acts giving rise to liability occurred, and [GLI] shall assume all

such Environmental Obligations and Indemnities with respect to all Properties, except (A) indemnities arising from Environmental Obligations which [Viad was] notified about prior to [March 1, 1992].

*Id.*, § 3.1.

As discussed above, the language of the contracts and the parties' course of dealing made clear that Viad's liability arose only upon (1) reasonable written notice, (2) of a UST leak, and (3) the start of remediation before March 1, 1992. GLI did not satisfy these requirements with respect to gasoline, lube oil, waste oil, hydraulic oil, and chlorinated solvent contamination, and most of the diesel contamination, and does not seek any recovery under CERCLA or the MTCA for the 1990 diesel vapor leak for which these requirements were satisfied. As a result, under the parties' agreements, GLI bears full liability for the Seattle contamination, including CERCLA and MTCA liability. The Court will enforce this contractual allocation of liability. *Jones-Hamilton Co.*, 973 F.2d at 692; *Car Wash Enterprises*, 874 P.2d at 873. GLI cannot recover anything from Viad under its statutory claims.

Even if the Court were to find that the contracts did not limit GLI's CERCLA and MTCA claims, it could not conclude that the $5.95 million purchase price reduction is recoverable under CERCLA or the MTCA. GLI has not shown that the contaminants addressed in the price reduction were released during Viad's operation of the Property. Although it is possible that releases occurred during Viad's operations, GLI bears the burden of proof on this issue and did not show by a preponderance of the evidence that releases occurred while Viad operated the site. The Court found Viad experts Steve Johnson and Tom Schruben to be as credible as GLI expert Peter Jewitt on this issue. And the evidence shows that gasoline, lube oil, and hydraulic oil were not found at the property until 2008, more than 20 years after Viad operations ceased. Nor were the sources of these contaminants ever identified. The significant diesel contamination at the site likely came from Tank 7, but the evidence suggests that the substantial releases from this tank occurred during GLI's operation. Free product diesel was not found until 1992,

about the time Tank 7 failed, and GLI itself noted that tests of the USTs before June 1989 showed the tanks to be tight. Ex. 15. Finally, as Tom Schruben noted, the chlorinated solvent contamination on the southern part of the property appears more likely to have been released by activities at the site than UST leaks. GLI continued those operations after it acquired the property.

In addition, the Court cannot determine what cleanup costs were actually paid by the $5.95 million purchase price reduction. That number was a negotiated compromise between GLI and the City of Seattle, and the numbers from which the City was negotiating included many costs unrelated to contamination for which Viad could be liable, such as redevelopment costs. The Court also finds Viad's expert Steve Johnson more persuasive than Peter Jewitt on the question of whether the remediation conducted by the City complied with the NCP for CERLCA purposes and was the substantial equivalent of a department conducted or supervised remedial action for MTCA purposes. The Court concludes that neither requirement was satisfied, particularly due to the lack of a feasibility study.

Because they are barred by the contracts and because their elements were not established by the evidence, the Court concludes that GLI cannot prevail on its claims for cost recovery under CERCLA or the MTCA.

IV.    **Viad's Breach of Contract Claims.**

Viad seeks to recover $547,177 it paid to GLI between January 29, 1992 and 2009. Exs. 735, 736. Viad claims that GLI breached the parties' contracts when it billed Viad for these amounts. Even if the Court could conclude that GLI breached the parties' agreements by these billing, it could not find for Viad. This is because at least a portion of Viad's claim is time-barred, and Viad has provided no basis for the Court to distinguish between timely and untimely claims.

A.    **Legal Standards.**

When evaluating whether breach of contract claims are barred by the statute of limitations, Arizona law applies the discovery rule. *Gust, Rosenfeld & Henderson v.*

*Prudential Ins. Co. of Am.*, 898 P.2d 964, 967-68 (Ariz. 1995). "Under the discovery rule, a plaintiff's cause of action does not accrue until the plaintiff knows or, in the exercise of reasonable diligence, should know the facts underlying the cause." *Id.* at 966. The discovery rule arises from a desire for fairness: "it is unjust to deprive a plaintiff of a cause of action before the plaintiff has a reasonable basis for believing that a claim exists." *Id.* at 967. Statutes of limitations are intended to protect defendants from stale claims where plaintiffs have slept on their rights, but "[a] blamelessly uninformed plaintiff cannot be said to have slept on his rights." *Walk v. Ring*, 44 P.3d 990, 995-96 (Ariz. 2002).

The key "inquiry in applying the discovery rule is whether the plaintiff's injury or the conduct causing the injury is difficult for plaintiff to detect." *Gust*, 898 P.2d at 968. The rule "does not permit a party to hide behind its ignorance when reasonable investigation would have alerted it to the claim." *ELM Ret. Ctr., LP v. Callaway*, 246 P.3d 938, 941 (Ariz. Ct. App. 2010). This means that a party must "exercise[] reasonable diligence in monitoring the performance of another under the contract." *Gust,* 898 P.2d at 969. "[T]he core question is whether a reasonable person would have been on notice to investigate." *Walk*, 44 P.3d at 996.

Arizona tolls the running of a statute of limitations "when a party wrongfully conceals facts giving rise to the cause of action so as to prevent a potential plaintiff from reasonably discovering the claim's existence during the limitation period." *Id.* at 999. "In general, to toll the statute of limitations the fraud must prevent inquiry, elude investigation or mislead the party who claims the cause of action. The concealment must come after the injury, and there must be some affirmative act of the defendant calculated to obscure the existence of a cause of action." *Anson v. Am. Motors Corp.*, 747 P.2d 581, 588 (Ariz. Ct. App. 1987) (internal quotation marks and citations omitted); *Cooney v. Phoenix Newspapers, Inc*., 770 P.2d 1185, 1187 (Ariz. Ct. App. 1989).

In this case, the parties agree that the breach of contract claims are subject to the six-year statute of limitations in A.R.S. § 12-548. Doc. 124, ¶ 7. Viad argues that its

claim to recover costs paid to GLI is not time-barred because it did not learn that GLI had billed it improperly until after GLI filed this lawsuit. Viad also contends that GLI intentionally concealed information that would have put Viad on notice that it was being wrongfully billed for remediation, tolling any limitations period. Because Viad seeks to recover payments it made to GLI more than six years before this lawsuit was filed, the only issues are when the limitations period commenced and whether it was tolled by GLI's alleged fraud.

**B.    Findings and Conclusions.**

GLI argues that Viad received regular information from GLI about the costs GLI was seeking to recover from Viad for the Seattle Property and other properties covered by the parties' contracts; Ken Ries – the person reviewing and approving the invoices for Viad – held a PhD in environmental engineering and understood what was occurring at each of the properties; Ries kept careful records about each property where Viad was liable for contamination, was not shy about making inquiries when more information was needed, and even visited sites when necessary; and GLI responded cooperatively to requests for more information from Viad. From these facts, GLI argues that Viad was on notice of the nature of the costs it was paying and cannot claim that the start of the limitations period was delayed under the discovery rule. GLI also emphasizes that a party to a contract must "exercise[] reasonable diligence in monitoring the performance of another under the contract." *Gust,* 898 P.2d at 969. Because Viad had access to whatever information it needed and paid 387 invoices over the course of more than 25 years for the Seattle Property, GLI argues that Viad was long ago on notice of any overpayments and should have made its claim much earlier than 2015.

Viad argues that GLI failed to disclose that it was billing Viad for costs related to a diesel leak it had not disclosed, waste oil, and chlorinated solvent contamination at the Property. Viad notes that invoices sent by GLI failed to identify the specific work done or the location of the work on the Property. Viad argues that GLI never informed it of the larger diesel UST leak found in 1992, contamination found during the closure of

waste oil tanks in the summer of 1992, or contamination discovered in later years. Viad argues that Ken Ries was careful in overseeing Viad's liability, even requiring GLI to assure Viad in its invoices that sums billed were properly allocable to Viad under the agreements. Ex. 618. Viad notes that June Weirich, who prepared most of the bills for GLI, testified that she had no basis for distinguishing between Seattle costs properly allocated to Viad and costs that should have been borne entirely by GLI, so she simply billed 60% of everything to Viad.

Viad seeks to recover $547,177, which represents all of the payments it made to GLI for the Seattle Property after January 29, 1992. When asked in closing arguments why it claimed that all payments after that date represented overpayments, Viad's counsel asserted that the only leak Viad was informed about at the Seattle Property was the minor diesel tank vapor leak in 1990, and that GLI began billing Viad in 1992 for much more significant diesel contamination than could not have been caused by the vapor leak. Viad chose January 29, 1992 as the beginning date for overpayments because that is the date on which GLI notified state regulators of the more significant diesel tank leak. *See* Ex. 607. In other words, Viad draws a line between all costs incurred before the more significant diesel leak was found and all costs incurred after that date.

There is a problem in Viad's line-drawing. Although it does appear that GLI failed to inform Viad of the January 1992 diesel tank leak, GLI did inform Viad of the diesel free product found around the time of that leak and GLI's plan to remediate it with a 60% contribution from Viad. On August 17, 1992, GLI's environmental manager wrote to Ken Ries and stated that GLI had been "actively pursuing soil and groundwater cleanup efforts at the Seattle garage for approximately one year." Ex. 275. The letter specifically stated that this included "a *free product* 'pump and treat' recovery system" and regular groundwater monitoring "[a]ssociated with the *free product* recovery efforts." *Id.* at 1 (emphasis added). As noted earlier, the presence of free product suggests significant contamination. The letter specifically stated that "the contaminant of concern is diesel fuel." *Id.* Thus, as of August 1992, Viad knew that GLI had encountered free

product diesel fuel at the Seattle Property and intended to remediate it. The letter further stated that GLI would be excavating and removing soils near "the UST system with TPH concentrations above 5,000 ppm." *Id.* This advised Viad that GLI was remediating significant soil contamination as well.

The letter explained that GLI had investigated a bioventing remediation system for the diesel contamination and estimated that it would cost $276,000 to implement, which was less costly than alternative remediation systems. *Id.* at 2. The bioventing would be run "in conjunction with the existing groundwater treatment system." *Id.*

The letter noted that GLI's environmental engineer had discussed these plans with Ken Ries, and that Ries initially said Viad would not pay 60% of the bioventing cost because it was an unproven technology. *Id.* GLI's letter enclosed a report regarding the technology and asked Viad to reconsider. *Id.*

Viad did reconsider. On September 4, 1992, Ken Ries wrote to GLI and said "[Viad] hereby accepts your plan to undertake a bioventing remediation at the [Seattle] site. It is my understanding that you anticipate the bioventing remediation plan to cost [Viad] 60 percent of an estimate[d] $276,000 over the next 24 months." Ex. 25. Mr. Ries then submitted an internal request for $166,000 to cover Viad's share of the bioventing system at the Seattle Property. Ex. 26. Attached to Ries's internal request was the GLI letter mentioning free product at the Seattle site, as well as a report from GLI's consultant regarding the bioventing remediation plan. The report stated that "[t]his work was initiated after a 1991 site assessment at the facility revealed petroleum hydrocarbon contamination in soils and groundwater exceed Washington Department of Ecology cleanup levels." *Id.*, page CIAD0014771.

From these documents, it is clear that Viad knew in the second half of 1992 that GLI was undertaking a significant diesel remediation effort at the Seattle Property. Viad knew that the contamination included free product diesel fuel and soil contamination above 5,000 parts per million. This is far more serious contamination than could have been caused by the 1990 vapor leak of which Viad had received notice. Indeed, Viad

asserted in closing arguments that the right place to draw the line was between the "de minimis" 1990 vapor leak and the significant diesel contamination evident at the site in 1992. *See also* Doc. 120, ¶ 79. Viad expert Tom Schruben testified that the diesel-tank vapor leak found in 1990 was minimal, and that most of the diesel contamination cleanup costs were unrelated to that leak. And yet Viad knowingly agreed to pay for remediation of the significant diesel contamination at the site.

None of this happened before the liability deadline of March 1, 1992, so the Court cannot conclude that Viad had sufficient notice from these communications to make it liable under the Third Amendment for all future diesel remediation. But Viad was on notice that it was paying for remediation of substantially greater diesel contamination than could have been caused by the 1990 vapor leak. This information was sufficient to trigger the running of the statute of limitations. Viad knew that GLI had not given it written notice of the source for the substantial diesel contamination at the site, and therefore had reason to believe it was being billed improperly. If Viad was going to complain about this improper billing – this breach of contract – Arizona law required that Viad do so within the next six years.

As noted above, the key "inquiry in applying the discovery rule is whether the plaintiff's injury or the conduct causing the injury is difficult for plaintiff to detect." *Gust*, 898 P.2d at 968. The fact that GLI was billing Viad for work not related to the 1990 vapor leak was not difficult to detect. Furthermore, a party must "exercise[] reasonable diligence in monitoring the performance of another under the contract." *Id.* at 969. No extraordinary monitoring was required here. GLI plainly told Viad that it was remediating free product diesel and soil contamination at a cost of more than a quarter million dollars, and invited Viad to pay its share. Viad agreed, at a cost of $166,000. The Court concludes that a reasonable person in Viad's position would have been on notice to investigate. *Walk*, 44 P.3d at 996. As a result, the discovery rule was satisfied in 1992 and the limitations period began running. Viad's claim for overpayment was time-barred long before Viad asserted its counterclaim in 2015.

Nor can the Court find that the limitations period was tolled by intentional concealment on the part of GLI. GLI informed Viad that it was remediating free product diesel and substantial soil contamination at the site, and the evidence at trial showed that Viad had the ability to obtain more information from GLI and its consultants when Viad wanted it. The Court cannot conclude that GLI prevented inquiry, eluded investigation, or misled Viad with respect to the contamination it was remediating. *Anson*, 747 P.2d at 588. Because the statute of limitations was not tolled, Viad's claim for repayment of costs incurred to remediate the diesel contamination is untimely.

This time-bar dooms Viad's entire counterclaim. Even if the Court could find that the discovery rule was not triggered for Viad's reimbursement claims relating to gasoline, lube oil, hydraulic oil, waste oil, or chlorinated solvent contamination, Viad has provided no basis for the Court to separate such overpayments from amounts it paid for remediating diesel contamination.[13]

Viad has the burden of proving its damages with reasonable certainty. *Gilmore v. Cohen*, 386 P.2d 81, 82 (Ariz. 1963). Viad has not done so with respect to non-diesel contamination. It simply seeks to recover 100% of the payments it made to GLI after January 29, 1992. Because Viad has failed to prove the amount of any timely claims, it has failed to prove its counterclaim.

Viad asserts a defense of recoupment, and argues that the defense is not subject to the statute of limitations. "[R]ecoupment is an equitable doctrine which can be used to reduce or eliminate a judgment, but not for affirmative relief." *Ness v. Greater Arizona Realty, Inc.*, 572 P.2d 1195, 1198 (Ariz. Ct. App. 1977). If GLI had recovered a judgment against Viad in this case, recoupment might be available to reduce that

---

[13] The Court notes that most of the money Viad paid after 1992 likely went to diesel remediation. Gasoline, lube oil, and hydraulic oil contamination were not even found until 2008 and therefore were not part of the costs at issue. And although some remediation steps were taken with respect to the waste oil tanks and chlorinated solvents in 1993, Viad has provided no evidence regarding the amount it paid for remediation of these contaminants between 1992 and 2009.

judgment. But because GLI has not recovered a judgment, recoupment is not available. It is not a source of affirmative relief for Viad. *Id.*

**IT IS ORDERED:**

1.     The Court finds in favor of Viad and against GLI on GLI's claims for breach of contract, breach of the covenant of good faith and fair dealing, CERCLA, and the MTCA, and orders that GLI take nothing on those claims.

2.     The Court finds in favor of GLI on Viad's counterclaim, and orders that Viad take nothing on the counterclaim.

3.     Motions for attorneys' fees, if any, shall be filed by **June 30, 2017**, and shall be limited to **17 pages**, exclusive of attachments. Responses shall be filed by **July 14, 2017**, and shall be limited to **17 pages**. Replies shall be filed by **July 21, 2017**, and shall be limited to **8 pages**.

Dated this 30th day of May, 2017.

David G. Campbell
United States District Judge